# ATLANTIC AND PACIFIC RAILROAD COMPANY *v.* MINGUS.

### ERROR TO THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 100. Argued December 15, 16, 1896. — Decided February 15, 1897.

Congress did not intend by the statutes under which the Atlantic and Pacific Railroad Company received its grants of public land, to vest the lands absolutely in the company, without a right to the Government to reacquire them on failure of the company to comply with the conditions of the grant; and no express provision for a forfeiture was necessary in order to fix the rights of the Government, and to authorize reëntry in case of breach of condition.

The act of April 20, 1871, c. 33, 17 Stat. 19, did not alter, amend or repeal the act of July 27, 1866, c. 278, 14 Stat. 292, in these respects, except so far as it permitted a foreclosure of any mortgage which might be put on the lands by the company to operate upon lands opposite and appurtenant to the then completed part of the road, and so far as it gave assurance that no forfeiture would be insisted upon for conditions then broken.

When the United States grant public lands upon condition subsequent, they have the same right to reënter upon breach of the condition which a private grantor would have under the same circumstances, which right is to be exercised by legislation.

Lands in the Indian Territory belonging to the Indians did not pass under the grant to the railroad company; and the United States were not required by the statutes to extinguish the Indian title for the benefit of the railroad company, nor could they be reasonably expected to do so.

As to Indian grants made subsequent to the grant to the railroad company,

there was no restriction upon the right of the government to dispose of public lands in any way it saw fit prior to the filing of the map of definite location; and if it assumed to dispose of lands within the grant, after the rights of the railroad company had attached, such action would be void, but it would be no answer to the obligation of the company to complete its road within the stipulated time.

Congress did not exceed its powers in forfeiting this grant.


THIS was an action of ejectment brought by the railroad company in the District Court for San Miguel County, New Mexico, to recover of the defendant Mingus a parcel of land, to which the plaintiff claimed title under its land grant, made by act of Congress of July 27, 1866, c. 278, 14 Stat. 292. Upon the trial it gave evidence tending to show that the land in controversy was part of an odd-numbered section of public lands within the primary limits of the grant, and was vacant, and in all respects subject to the grant, both at the date thereof and at the date of the definite location of the road (March 12, 1872), and therefore passed to and became vested in the company at that date.

Defendant pleaded not guilty, and relied upon a patent for the same land issued December 10, 1891, to one Albert W. Bray, founded upon a preëmption filing made January 9, 1888. Whilst conceding the original vesting of title in the railroad company on March 12, 1872, and its undisturbed continuance until July 6, 1886, defendant claimed that under an act of Congress, approved upon that day, c. 637, 24 Stat. 123, declaring a forfeiture of the land grant, the title of the company was annulled and became revested in the United States, and, from that time, the land was properly subject to preëmption.

Plaintiff denied the validity of the alleged act of forfeiture; contended that it was ineffectual to annul its title, and hence that the patent of the defendant was issued without authority and was void upon its face.

The facts of the case were substantially as follows:

The company was originally incorporated by the act of July 27, 1866, c. 278, 14 Stat. 292, and by § 1 of the act was authorized to construct a continuous railroad and telegraph line from " the town of Springfield, in the State of Missouri,

thence to the western boundary line of said State, and thence by the most eligible railroad route as shall be determined by said company to a point on the Canadian River, thence to the town of Albuquerque on the river Del Norte, and thence by way of the Agua Frio or other suitable pass to the headwaters of the Colorado Chiquito, and thence along the thirty-fifth parallel of latitude, as near as may be found most suitable for a railway route, to the Colorado River, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route to the Pacific. The said company shall have the right to construct a branch from the point at which the road strikes the Canadian River eastwardly, along the most suitable route as selected, to a point in the western boundary line of Arkansas at or near the town of Van Buren."

By § 2, authority was given to the company to take materials from the public lands adjacent to the line of the road for its construction, and the United States agreed to "extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act."

By § 3, there was granted to the company, for the purpose of aiding in the construction of the railroad and telegraph, etc., "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State."

By § 6, the President of the United States was to cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, "after the general route shall be fixed, and as fast as may be required by the construction of said railroad."

The eighth, ninth and seventeenth sections were as follows:
"SEC. 8. *And be it further enacted*, That each and every

grant, right and privilege herein are so made and given to and accepted by said Atlantic and Pacific Railroad Company, upon and subject to the following conditions, namely: 'That the said company shall commence the work on said road within two years from the approval of this act by the President, and shall complete not less than fifty miles per year after the second year, and shall construct, equip, furnish and complete the main line of the whole road by the fourth day of July, anno Domini eighteen hundred and seventy-eight.

"SEC. 9. *And be it further enacted*, That the United States make the several conditional grants herein, and that the said Atlantic and Pacific Railroad Company accept the same, upon the further condition that if the said company make any breach of the conditions hereof, and allow the same to continue for upwards of one year, then, in such case, at any time hereafter, the United States may do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road."

"SEC. 17. *And be it further enacted*, That the said company is authorized to accept to its own use any grant, donation, loan, power, franchise, aid or assistance which may be granted to or conferred on said company by the Congress of the United States, by the legislature of any State, or by any corporation, person or persons, or by any Indian tribe or nation through whose reservation the road herein provided for may pass; and said corporation is authorized to hold and enjoy any such grant, donation, loan, power, franchise, aid or assistance, to its own use, for the purpose aforesaid: *Provided*, That any such grant or donation, power, aid or assistance from any Indian tribe or nation shall be subject to the approval of the President of the United States."

By the twentieth section the right was reserved to Congress, " at any time, having due regard for the rights of said Atlantic and Pacific Railroad Company," to "add to, alter, amend or repeal this act."

The company proceeded with its organization, but up to April 20, 1871, had only been able to construct 75 miles of its road, including 34 miles in the Indian Territory, extending

westward from its eastern terminus at Springfield, Missouri. Along that construction in the State of Missouri, there was but little unappropriated public land available under the grant to aid in building the road. From the west line of Missouri to the west line of the Indian Territory, about 350 miles, the lands were unsurveyed, and were wholly embraced in Indian titles which the United States had not extinguished, and none of those lands were available to aid in construction. From thence, through New Mexico and Arizona to the Colorado River, the route of the road ran through numerous reservations occupied by hostile and warlike Indians, the boundaries of which reservations were subsequently enlarged by the United States, and new reservations created. Most of the lands which were not included in such unextinguished Indian occupancy were then unsurveyed, and were largely taken up by unadjusted Mexican land claims. It also appears that the surveying and engineering parties of the company were stopped by orders from the Secretary of the Interior from continuing westward through the Indian Territory, and the company was unable to proceed until March, 1871, and then only upon executing a bond in the sum of half a million of dollars, conditioned for the protection of the Indian tribes, through whose territory the line of route was required to pass by the act of Congress.

For these reasons the company was compelled to stop work, and appeal to Congress for express authority to mortgage its land grant in advance of the construction of the road, so as to secure capital for the prosecution of the work. Thereupon, on April 20, 1871, Congress passed an act, c. 33, 17 Stat. 19, authorizing the company to mortgage its property, with a proviso that "if the company shall hereafter suffer any breach of the conditions of the act above referred to (July 27, 1866), under which it is organized, the rights of those claiming under any mortgage made by the company to the lands granted to it by said act shall extend only to so much thereof as shall be coterminous with or appertain to that part of said road which shall have been constructed at the time of the foreclosure of said mortgage."

Under the authority of this act the company executed mort-
gages to the aggregate amóunt of $31,500,000, of which
$3,590,629 was secured by mortgages upon the central division
of the road extending from the west line of Missouri to
Albuquerque, and embracing the lands here in controversy.

By July 4, 1878, the date fixed by the act of 1866 for
the completion of the road, the company had constructed
only 125 miles out of the 2267 miles contemplated for the
entire line; but, in order to have an outlet to the markets of
St. Louis, and the transportation facilities of the Mississippi
River, it had, in October, 1870, purchased the Southern Pacific
railroad, then built from Pacific City, thirty-seven miles west
of St. Louis, to Springfield. Owing, as is claimed, to the
financial panic of 1873, and the failure of the United States
to extinguish the Indian titles through the Indian Territory,
or of the company to acquire them, no substantial progress
was made with the road from 1871 until about the beginning
of 1880, when the company made such arrangements as to
enable it to resume the work of construction. In order to do
this, however, it had to give up operations in the Indian
Territory, and by making connection with the Atchison,
Topeka and Santa Fé, whose construction had then reached
the line of the Atlantic and Pacific at Albuquerque in New
Mexico, it became practicable to build westward to the Pacific
Ocean, and thus avoid many of the obstacles and hindrances
which had been encountered in the Indian Territory. There
were then constructed and equipped, at a cost of $16,000,000,
about fifty miles more in the Indian Territory, and 560 miles
westward from Albuquerque to "The Needles" on the Colo-
rado River, all of which were examined and accepted by
order of the President. It also acquired, by contract of
purchase at an expense of $7,290,000, two hundred and forty-
three miles of road from The Needles to Mojave, California,
which had been constructed by the Southern Pacific Railroad
Company, and by a trackage contract with the Southern
Pacific the Atlantic and Pacific obtained the right to run its
own cars to San Francisco, and to conduct to that point an
independent and competitive freight and passenger business.

On July 6, 1886, the company had about 1228 miles of con-
structed road, equipped and in operation, of which, however,
it had itself constructed only 747 miles. That portion of
the line from Sepulpa, in the Indian Territory, to Albu-
querque, and from Mojave to the Pacific, were in 1886, and
still remain, unconstructed.

Upon this state of facts, on July 6, 1886, Congress passed
an act, c. 637, 24 Stat. 123, declaring all the lands, excepting
the right of way, "adjacent to and coterminous with the
uncompleted portions of the main line of said road, embraced
within both the granted and indemnity limits, as contemplated"
by the act of organization, to be "forfeited and restored to
the public domain." The validity of this act raised the only
question at issue between the parties.

Upon the trial, the court directed a verdict for the defend-
ant ; plaintiff sued out a writ of error from the Supreme Court
of the Territory, which affirmed by a divided court the judg-
ment of the court below, 34 Pac. Rep. 592, whereupon plaintiff
sued out a writ of error from this court.

*Mr. E. J. Phelps* and *Mr. A. B. Browne,* (with whom was
*Mr. A. T. Britton* on the brief,) for plaintiff in error.

When the grant was, on March 12, 1872, identified by the
filing and acceptance of the map of definite location the legal
title to the land in controversy vested in the railroad company
as of the date of the grant, and unless thereafter divested by
voluntary relinquishment, or by due process of law, the rail-
road company and its assigns have the continuing right
of possession against all subsequent claimants or patentees.
*United States* v. *Southern Pacific Railroad,* 146 U. S. 570, 594,
595 ; *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241 ; *Wright* v.
*Roseberry,* 121 U. S. 488.

These decisions state the law as reiterated by this court in
numerous other opinions, too familiar to require citation. It
may, therefore, be safely assumed as settled law that, inasmuch
as the land in controversy was part of an odd-numbered section,
not mineral, situate within the primary limits of the grant and

along the line of definite location filed and approved March 12, 1872, and not included within any of the exceptions from the grant, but in all respects subject thereto, the legal title of the railroad company attached and the right of possession continued perfect as against a subsequent patentee under the United States, unless such legal title has been divested by voluntary relinquishment or by due process of law.

There is no pretence of voluntary relinquishment, but the court below has decided that the legal title vested in the railroad company, subject to a reserved right in the United States to enforce a legislative forfeiture of the grant, upon failure to construct within a prescribed time; that there was a breach of such condition subsequent; and that the act of July 6, 1886, lawfully declared forfeiture and, by mere force of the statute, reinvested the legal title in the United States.

In support of our contention as to the incorrectness of this decision, and as to the unconstitutionality and invalidity of the act of July 6, 1886, the argument naturally invites a careful examination of the following propositions:

1. What were the conditions subsequent of the grant of July 27, 1866?

2. Was not said grant a legislative contract equally binding upon both parties thereto, and, if default upon part of the railroad company occurred or was compelled, through failure of the United States to perform its contract obligations, could the United States enforce such conditions subsequent?

3. Were not the rights reserved to the United States by the act of July 27, 1866, subordinated to the rights acquired by the subsequent act of April 20, 1871?

4. Can the legal title once vested under the act of July 27, 1866, be divested by a mere legislative declaration, containing no provision for any judicial inquiry into the facts upon which it is provided and extending to the grantee no opportunity of urging any equitable or other considerations by reason of which the breach of condition might be excused, or the condition itself discharged?

I. The court below has assumed that the same right of absolute forfeiture which, in other land grants by Congress

was expressly reserved to the United States, was equally reserved in this grant by necessary implication. The theory seems to be to read the terms of this statute, no matter how different in expression or intent, as in *pari materia* with other though wholly variant grants.

But suppose that there had been no conditions subsequent — no reservation of rights to the government — but simply a grant without conditions? In such case there could be no invoking of the analogy of other grants, based upon conditions subsequent, and with reservation of right to the grantor. Such case would clearly be controlled by the principle of the *Courtright case*, 21 Wall. 310, 315, where this court held that the title to 120 sections authorized to be sold before construction was absolute, because "No conditions therefore of any kind were imposed upon the State in the disposition of this quantity, Congress relying upon the good faith of the State to see that its proceeds were applied for the purposes contemplated by the act."

In such case, at the utmost the United States would only be entitled to the same equitable remedy that might obtain in case of a private grantor where consideration had wholly failed. It would have to be pursued in a court of chancery, and could not be effected by a mere legislative declaration.

We therefore maintain with confidence that the conditions subsequent of the act of 1866 are not to be read in the light or analogy of other and wholly variant statutes. They are to be tested by their own expressions, with resort, in case of ambiguity, to the purpose of Congress as shown by cotemporaneous history.

The only part of the Atlantic and Pacific grant which indicated an intent on the part of Congress to divest the grantee of any rights for failure of timely performance is found in the 19th section. That declared in unequivocal language that unless the company obtained the required amount of subscriptions within a stipulated time, "the act shall be null and void." The entire law will be searched in vain for any other indication of an intent by Congress.

II. The grant of July 27, 1866, coupled with the obligations

on part of the government attached thereto, was not only a law which incorporated the company, but it was also a legislative contract. To the performance of such contract obligations the Government was as much bound as the grantee. As this court said in the *Sinking Fund cases*, 99 U. S. 700, 719 : "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a state or a municipality or a citizen. No change can be made in the title created by the grant of the lands or in the contract for the subsidy bonds without the consent of the corporation. All this is indisputable."

The grant of lands was to enable the Atlantic and Pacific railroad to secure a construction fund. The absolute necessity for such governmental aid was the basis of the grant. In the theory of the law the road could not be built without it. Hence Congress said that we will give you this grant to aid you in raising moneys for construction purposes, and we require you to utilize its proceeds by completing construction within a given time, but, as the grant would be otherwise valueless to you, we will agree to do the things necessary to put it into available shape. Those absolutely necessary things, and without which the lands were scarcely worth a penny, were to extinguish the Indian titles and to survey the lands (sections 2 and 6, act July 27, 1866). The road had to be built from Springfield, Missouri, southwest to the Indian Territory, and thence west for three hundred and fifty miles through the Indian Territory. It was promptly built to and as far into the civilized parts of the Indian Territory as the condition of the unextinguished titles would permit. Then it had to cease operations and await the promised action of the United States in extinguishing those titles.

It is confidently submitted that the United States can lawfully exercise no reserved right of forfeiture or otherwise under the contract of July 27, 1866, so long as the United States effectually bars the way to agreed performance by the railroad company by failure to make the grant available

through the stipulated extinguishment of the Indian titles and by identifying the grant by surveys. The principle contended for has been heretofore announced by this court. In *Davis* v. *Gray*, 16 Wall. 203, 230, it was ruled that "the rule at law is, that if a condition subsequent be possible at the time of making it, and becomes afterwards impossible to be complied with, by the act of God, or the law, or the grantor, the estate having once vested, is not thereby divested, but becomes absolute. The analogy of that rule applied here would blot out these conditions. But this would be harsh and work injustice. Equity will therefore not apply the rule to that extent. It will regard the conditions as if no particular time for performance were specified."

III. The third question is equally pertinent whatever may be determined to be the reserved power of the United States under the act of July 27, 1866.

At the time of the enactment of the law of April 20, 1871, the railroad company was in default as to the condition contained in section 8 of the act of July 27, 1866. Construction had ceased for several years. Whatever was the reserved power of the United States upon condition broken, it had then attached and was fully enforceable. Upon and applicable to this condition of existing default and right of reëntry for condition broken, the act of 1871 was enacted. If it had been the intention of Congress that upon such existing default construction should cease and the enterprise terminate, it would surely have legislated in this act of 1871, in unambiguous terms, for the resumption of the grant, or upon the continuance of such right of resumption, if that was the reserved power in the act of 1866. Instead of this the action of Congress, upon the construction for which we contend, was in exact conformity with the powers reserved in sections 9 and 20, viz., to alter or add to the act so as to promote the construction and insure the completion of the road. For that purpose the act of 1871 offered a fresh inducement to the investment of private capital in this national work. To that end, it authorized the company to mortgage its lands to secure bonds to be issued, with the one solitary limitation in the form of a proviso, that, in case

of subsequent breach of condition, the right of the mortgagees should only extend to lands coterminous with road constructed at the time of the foreclosure of said mortgages.

The question turns upon the proviso. There is nothing ambiguous in its language. "At the time of the foreclosure of said mortgage" are words of common and every day use. Lawyer and layman understand them alike. The only way to avoid their ordinary effect is to construe them out of existence, either by treating those words as surplusage, or by substituting others in their stead. It is surely a reasonable contention, that if by the terms of the original act an absolute forfeiture of the grant was to be the consequence of a breach of condition, and if it had been the intention of Congress, while granting subsequent authority to mortgage the grant, to limit the right of mortgagees to lands appertaining to road constructed at date of the breach, or at date of forfeiture, Congress would have said so in apt terms. It would not have left room for doubt as to its intent.

Congress, by this act of 1871, intentionally legislated, 1st, to condone all past default, the language used being "that if the company shall hereafter suffer any breach of the conditions," etc.; 2d, to entirely change the conditions of the legislative contract so as to subordinate the reserved power of the Government to the rights of the mortgagees. The words "at the time of reentry upon conditions broken" were purposely stricken from the meaning of the contract, and in lieu thereof was inserted the equally plain but essentially variant words, "at the time of the foreclosure of the mortgage." If the corporation failed to apply the land grant and the moneys raised thereon to seasonable construction, Congress assumed that the mortgagees would intervene for their own protection, and would see that their security was made good by construction. It further assumed that a foreclosure of their mortgages would be evidence that both the company and its mortgagees had abandoned the work; and in such event it provided that the United States could then see to the intended application of the residue of lands not coterminous with construction.

IV. The legal title once vested cannot, under the act of

July 27, 1866, be divested by mere legislative declaration, containing no provision for any judicial inquiry into the facts upon which it is founded and extending to the grantee no opportunity of urging any equitable or other consideration by reason of which the breach of condition might be excused, or the condition itself be discharged.

. The act of 1886 is a naked declaration of forfeiture and a legislative restoration of the lands to the public domain. It contains no recital of breach of condition. It alleges no failure of performance upon the part of the grantee. It provides for no judicial inquiry into alleged facts of failure to perform, nor the legal effect thereof, nor offsets thereto. It authorizes no subsequent proceedings of any kind to effect a forfeiture or to extend a hearing to the parties in interest. . It contains no suggestion of any purpose of devoting the lands to the completion of the road in some other way, or even through some other agency. There is no provision protecting the vested rights of the mortgagees, nor making the proposed restoration of the lands subject to their possible rights. The law simply declares forfeiture and requires an immediate restoration of the lands to the public domain. It seeks by legislative declaration to divest the outstanding fee-simple title, and by mere force of the statute to reinvest that title absolutely in the United States.

The power of the United States to take these lands from the railroad company and apply them in some other way or through some other agency to the construction of the "continuous" highway provided for by the act of 1866 may not be seriously challenged, but the forfeiture act of 1886 does not even pretend to do that. It simply restores the lands to the public domain, and thereby subjects them to sale and entry under the general public land laws. Where then, as in this case, the United States patents them off to an individual entryman, it is manifest they cannot be applied to the purpose to which they were thus originally dedicated. viz., the final completed construction of this "continuous" national and governmental highway under the contract of the United States to devote them to that purpose and no other.

We submit that a mere legislative declaration is not valid so as to effectuate that purpose; that it operates simply as an announcement of the legislative will to assert the reserved rights of the government; but that some proceeding, which shall have a semblance of "due process of law," must follow to determine the rights involved, so as to divest the title of the grantee and to reinvest it in the grantor.

*Mr. Assistant Attorney General Dickinson* for the United States. *Mr. Joseph H. Call* filed a brief for same.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

While the value of the land involved in this case is small, the question at issue between the parties affects the validity of the entire land grant of the company adjacent to and coterminous with all that part of the main line of the road not completed on July 6, 1886. The case turns wholly upon the validity of the act of that date, forfeiting that portion of the land grant.

Plaintiff claims in this connection that the act was invalid, inasmuch as the United States had failed to perform their own obligations in two particulars: *First*, that they not only failed to extinguish the Indian title to lands along the prescribed route of the road, but had since further encumbered the grant by the creation of additional Indian reservations, carved out of the granted lands. *Second*, that they also largely failed to survey the lands as required by the sixth section, although repeatedly urged and requested to do so by the railroad company.

1. The reserved rights of the United States with respect to this land grant are contained in the eighth, ninth and twentieth sections of the original act, and are as follows: By § 8 the grant was made subject to the condition that the company should commence work within two years from the approval of the act, and should complete not less than fifty miles a year after the second year, and should complete the main line of

the whole road by July 4, 1878. By § 9, a "further condition" was imposed: that if the company made any breach of the conditions of the act, and allowed the same to continue for upwards of one year, the United States might do anything which might be needful and necessary to secure the speedy completion of the road. And by § 20 the general power was reserved to Congress to alter, amend or repeal the act, subject only to a due regard for the rights of the company.

The position of the plaintiff is that the rights of the United States were fixed and limited by § 9; that Congress did not intend that the grant should ever be forfeited, but that, upon a breach of any of the conditions, the United States could only take steps itself to insure the speedy completion of the road.

What steps the government could take in that direction, and what the effects of its action upon the land grant might be, it is difficult to decide. It would seem highly inequitable, however, that if the government were compelled to go on and complete the road at its own expense the company should yet be able to retain the land grant, the condition of which was the completion of the road at its expense. The act makes no provision whatever for the disposition of the land grant in this contingency. What remedy the government would have had in case it had elected itself to go on and complete the road is left entirely to conjecture. Some further action on the part of Congress would seem to have been necessary.

Aside from this difficulty, however, we are clearly of opinion that Congress intended to impose this simply as a "further condition," consequent upon a breach by the railroad company of its stipulations, and to reserve to the United States the option of forfeiting the grant entirely, or of taking measures to insure the speedy completion of the road. This further condition was obviously intended for the benefit of the government, and with no purpose of merging other conditions, or of superseding other remedies to which it might be entitled. While, by the act of July 27, 1866, like other similar acts passed about the same time, it was doubtless intended that the grant should operate *in præsenti*, it certainly never could have been contemplated that, in case the

company took no steps toward the completion of the road, the government could not forfeit the grant, and could resort to no other remedy than building the road itself. It certainly would be highly inequitable as well as impolitic that the company should retain the land grant and do nothing toward the construction of the road, or that the lands granted should be permanently withdrawn from the public domain. A more reasonable interpretation would be to say that Congress contemplated a possibility that the company might proceed in good faith with the construction of the road, and might so nearly approach its completion that it would be for the best interests of the government to go on itself and complete it rather than to insist upon an entire forfeiture of the grant. Even if § 9 were intended as a limitation upon the power of Congress, which might otherwise be inferred from § 8, the power reserved by § 20 to alter, amend or repeal the act, except so far as its exercise might interfere with the just rights of the company, being the latest expression of the legislative will, may properly be construed to dominate the others.

But little light is to be gained in the consideration of this question by referring to the conditions for forfeiture or reinvestment of title under other railway land grant acts. There is no such uniformity in the terms of their conditions subsequent as to lead us to give any different construction to the three sections in question than such as their language plainly requires. It cannot be supposed that Congress intended to vest a title in the railway company to this enormous grant of lands without contemplating that the Government might in some way reacquire it in case of a failure of the company to comply with the conditions of the grant. No express provision for a forfeiture was required to fix the rights of the Government. If an estate be granted upon a condition subsequent, no express words of forfeiture or reinvestiture of title are necessary to authorize the grantor to reënter in case of a breach of such conditions. *Stanley* v. *Colt*, 5 Wall. 119; *Mead* v. *Ballard*, 7 Wall. 290; *Ruch* v. *Rock Island*, 97 U. S. 693; *Hayden* v. *Stoughton*, 5 Pick. 528; *Jackson* v. *Allen*, 3 Cowen, 220; *Gray* v. *Blanchard*, 8 Pick. 283. And the fact that

Congress imposed as a further condition the right to complete the road itself, did not deprive it of the power of resorting to other remedies to which the breach of such conditions entitled it.

2. As to the proper construction of the act of April 20, 1871. This act, in general terms, authorized the railroad company to make and issue its bonds in such sums as it pleased, and to mortgage its road, etc., to secure them, with a proviso that if the company should *thereafter* suffer any breach of the conditions of its act of organization, the rights of those claiming under the mortgage of the land grant should extend only to so much thereof as should be " coterminous with or appertain to that part of said road which shall have been constructed at the time of the foreclosure of said mortgage." Conceding that, with respect to the rights of the mortgagees, at least, this act was a condonation of the breach of any condition which had previously occurred, it left the rights of the Government unimpaired with respect to any breach which should thereafter occur, and expressly limited the rights of the mortgagees to such land as should appertain to and be coterminous with the completed portion of the road at the time of the foreclosure. It is insisted by the plaintiff that the final words of this act indicate an intention on the part of Congress to extend the time for the construction of the road until such time as the mortgagees might see fit to foreclose. But we do not so read it. There is nothing in the act evincing an intention on the part of Congress to waive any of the conditions of the act of 1866, except so far as such conditions had already been broken. Congress doubtless anticipated that the mortgage might be foreclosed, and desiring to provide against the possible contingency that the mortgagees might claim the right to sell the entire land grant upon the foreclosure, declared that it should operate only upon that part of the grant appertaining to the completed portion. If there were any ambiguity in this act we should feel bound, upon familiar principles, to give the Government the benefit of the doubt, *Dubuque & Pacific Railroad* v. *Litchfield,* 23 How. 66, 88; *Leavenworth, Lawrence &c. Railroad* v. *United States,* 92 U. S. 733, 740; *Coosaw Mining Co.* v. *South Carolina,* 144

U. S. 550, 562. ·But in our view there is no case made calling for the application of this rule, as the intention of Congress to simply limit the remedy of the mortgagees seems entirely clear. The original act being silent upon the subject of mortgaging the grant, there is reason to suppose that Congress passed the act for the purpose of resolving any doubts that capitalists may have entertained with respect to such power. The mortgagees, standing in the place of the mortgagor, had no greater rights than it had, and must be held to have known that they were taking an estate which was defeasible upon condition broken. It cannot be supposed that Congress intended to postpone indefinitely, or until the mortgagees chose to foreclose, any remedy it might have against the mortgagor for a breach of its covenants. The plain meaning of the proviso is to permit any foreclosure of the mortgage to operate only upon such lands as are opposite and appurtenant to that part of the road which should be constructed at the time of the foreclosure, but not to extend for a day the time within which the road should be completed. The act also had a purpose in its assurance to mortgagees that no forfeiture would be insisted upon for conditions already broken, and that they might safely advance their money, if no breach should thereafter occur. Except to this extent there was no intention by this act to alter, amend or repeal the act of 1866.

3. Coming now to the act of 1886, forfeiting the grant, it is claimed in the first place that Congress has no right by simple act to forfeit a title already vested, without providing for a judicial inquiry as to whether there has been a breach of a condition on the part of the grantee, and the legal effect of such breach; and, also, whether there has not been a breach on the part of the United States which would estop them from claiming a forfeiture. There is no doubt that, where an estate is granted subject to a condition subsequent, the mere fact that there has been a breach of such condition will not revest the title in the grantor without some act or declaration upon his part. *Ruch* v. *Rock Island,* 97 U. S. 693, 696. In this case it was said by Mr. Justice Swayne that "it was not denied by the plaintiff that the title had passed, and that the

estate had vested by the dedication. If the condition subsequent were broken, that did not, *ipso facto,* produce a reverter of the title. The estate continued in full force until the proper step was taken to consummate the forfeiture. This act can only be done by the grantor during his lifetime, and after his death by those in privity of blood with him." In the case of a private grant this is ordinarily done by reëntry on the part of the grantor, although, as was said in this case, " bringing suit for the premises by the proper party is sufficient to authorize a recovery without actual entry or a previous demand of possession." *Cowell* v. *Springs Co.,* 100 U. S. 55; *Austin* v. *Cambridgeport Parish,* 21 Pick. 215; *Jackson* v. *Crysler,* 1 Johns. Cas. 125; *Hosford* v. *Ballard,* 39 N. Y. 147; *Cruger* v. *McLaury,* 41 N. Y. 219; *Cornelius* v. *Ivins,* 2 Dutch. 376.

But where the grant is a public one, this court has held in a series of cases that the remedy of the Government is by an inquest of office or office found, a judicial proceeding but little used in this country, or by a legislative act directing the possession and appropriation of the land.

Blackstone defines an inquest of office as " an inquiry made by the king's officer, his sheriff, coroner or escheator, *virtute officii,* or by writ to them sent for that purpose, or by commissioners specially appointed, concerning any matter that entitles the king to the possession of lands or tenements, goods or chattels. This is done by a jury of no determinate number; being either twelve, or less, or more. . . . These inquests of office were devised by law, as an authentic means to give the king his right by solemn matter of record; without which he, in general, can neither take nor part from anything." 3 Black. Com. 258, 259.

The necessity of an inquest of office was considered by this court at an early day in two cases. In *Smith* v. *Maryland,* 6 Cranch, 286, it was held that, by the confiscation act of Maryland, passed in 1780, before the adoption of the Constitution, interests in land were completely divested by operation of law, without office found. The validity of the act was apparently not considered.

The case of *Fairfax's Devisee* v. *Hunter's Lessee*, 7 Cranch, 603, involved the title to a large tract of land in Virginia, granted to Lord Fairfax. The lands were devised by will to Denny Fairfax, a British subject, who never became a citizen of the United States, but always resided in England, and was an alien enemy. In 1789, the governor of the Commonwealth of Virginia granted the lands by patent to Hunter, a citizen of Virginia, who entered into possession prior to the institution of the action. It was the opinion of the court that the title acquired by an alien by purchase is not divested until office found, although it was contended that the common law as to inquests of office had been dispensed with by statute, so as to make the grant to Hunter complete and perfect. As to this point Mr. Justice Story observed, p. 622: "We will not say that it was not competent for the legislature (supposing no treaty in the way), by a special act, to have vested the land in the Commonwealth without an inquest of office for the cause of alienage. But such an effect ought not, upon principles of public policy, to be presumed upon light grounds; that an inquest of office should be made in cases of alienage, is a useful and important restraint upon public proceedings. . . . It prevents individuals from being harassed by numerous suits introduced by litigious grantees. It enables the owner to contest the question of alienage directly by a traverse of the office. It affords an opportunity for the public to know the nature, the value and the extent of its acquisitions, *pro defectu hæredis;* and above all it operates as a salutary suppression of that corrupt influence which the avarice of speculation might otherwise urge upon the legislature. The common law, therefore, ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose." It was further held that during the war the lands in controversy were never, by any public law, vested in the Commonwealth. It was also held that the treaty of 1794 with Great Britain completely protected and confirmed the title of Denny Fairfax. Mr. Justice Johnson, dissenting, was of opinion that the interest acquired by Denny Fairfax under the devise was a mere *scintilla juris,* and that that

*scintilla* was extinguished by the grant of the State vesting the tract in Hunter; that it was competent for the State to assert its rights over an alien's property by other means than by an inquest of office; that in Great Britain, in the case of treason, an inquest of office had been expressly dispensed with by the statute of 33 H. VIII, c. 30, and that he saw no reason why it was not competent for the legislature of Virginia to do the same.

Subsequent cases in this court have asserted this power to exist beyond any controversy. As was said in *United States v. Repentigny*, 5 Wall. 211, 268: "The mode of asserting or of assuming the forfeited grant is subject to the legislative authority of the Government. It may be after judicial investigation, or by taking possession directly, under the authority of the Government, without these preliminary proceedings." Practically the same language is used in *Schulenberg v. Harriman*, 21 Wall. 44, 63. In *Farnsworth v. Minnesota & Pacific Railroad Co.*, 92 U. S. 49, 66, we said: "A forfeiture by the State of an interest in lands and connected franchises, granted for the construction of a public work, may be declared for non-compliance with the conditions annexed to their grant or to their possession when the forfeiture is provided by statute, without judicial proceedings to ascertain and determine the failure of the grantee to perform the conditions. Such mode of ascertainment and determination — that is, by judicial proceedings — is attended with many conveniences and advantages over any other mode, as it establishes as matter of record, importing verity against the grantee, the facts upon which the forfeiture depends, and thus avoids uncertainty in titles and consequent litigation. But that mode is not essential to the divestiture of the interest where the grant is for the accomplishment of an object in which the public is concerned, and is made by a law which expressly provides for the forfeiture when that object is not accomplished. Where land and franchises are thus held, any public assertion by legislative act of the ownership of the State, after default of the grantee — such as an act resuming control of them and appropriating them to particular uses, or granting them to

others to carry out the original object — will be equally effectual and operative."

These cases were all quoted with approval, and the doctrine reasserted in *McMicken* v. *United States*, 97 U. S. 204, 217; *Van Wyck* v. *Knevals*, 106 U. S. 360, 368.

These cases are not put upon the ground that the United States reserved the right to declare a forfeiture, or even provided expressly for a reversion of title in case of a breach, but upon the general ground that the Government was vested with the same right as a private grantor, upon breach of a condition subsequent, though such right was, from the necessities of the case, to be exercised in a somewhat different manner, viz., by legislative act instead of reëntry.

But while we think the practice of forfeiting by legislative act is too well settled to be now disturbed, we do not wish to be understood as saying that this power may be arbitrarily exercised, or that the grantee may not set up in defence any facts which he might lay before a jury in a judicial inquisition. It would comport neither with the dignity of the Government nor with the constitutional rights of the grantee, to hold that the Government by an arbitrary act might devest the latter of his title when there had been no breach of the conditions subsequent, or when the Government itself had been manifestly in default in the performance of its stipulations. The inquiry in each case is a judicial one, whether there has been, upon either side, a failure to perform, and it makes but little practical difference whether such inquiry precedes or follows the reëntry or act of forfeiture.

The charge, in this connection, is that the Government not only failed in its legal obligation to extinguish the Indian titles and to survey the lands, but, upon the contrary, has still further burdened these titles with the very cloud it stipulated to remove by additional reservations in favor of the Indians. The main contest in the case has been upon this point. In locating the road between Springfield, in Missouri, and Albuquerque, in New Mexico, the most direct route lay, for 350 miles, through the Indian Territory. To determine whether the Government has been derelict in this particular, it is nec-

essary to compare the several sections of the act to ascertain exactly what the grant covered, and to what extent the legal rights of the grantee were impaired by the non-action of the Government. By the third section of the act a grant was made of twenty sections per mile on each side of the line through the *Territories*, and ten sections per mile through the States, subject to the conditions that " whenever, on the line thereof, the United States shall have full title not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the Commissioner of the General Land Office, and whenever, prior to said time, any of said sections or part of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted or otherwise disposed of, other lands shall be selected by said company in lieu thereof." If the grant stood upon this language alone, there could be no doubt that, as the lands in the Indian Territory had been set apart for the sole use and occupation of various Indian tribes, they were reserved lands within the meaning of that section. *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733. It was held in this case that a grant of lands, in similar terms to the one under consideration, did not apply to lands which had been reserved to the Osage tribe of Indians within the State of Kansas, whether the Indian right were extinguished before or after the definite location of the route. See also *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629; *Bardon* v. *Northern Pacific Railroad*, 145 U. S. 535.

Indeed, it is open to serious doubt whether that large tract of land, known distinctively as the Indian Territory, is a Territory of the United States within the meaning of the act. While, for certain purposes, such for instance as the enforcement of the criminal and internal revenue laws, it has been recognized as such, and within the jurisdiction of the United States, *United States* v. *Rogers*, 4 How. 567; *The Cherokee Tobacco*, 11 Wall. 616, a reference to some of the treaties, under which it is held by the Indians, indicates that it stands in an entirely different relation to the United States from other

Territories, and that for most purposes it is to be considered as an independent country. Thus in the treaty of December 29, 1835, 7 Stat. 478, with the Cherokees, whereby the United States granted and conveyed by patent to the Cherokees a portion of this territory, the United States, in article 5, covenanted and agreed that the land ceded to the Cherokees should " in no future time, without their consent, be included within the territorial limits or jurisdiction of any State or Territory "; and by further treaty of August 16, 1846, 9 Stat. 871, provided (Art. 1) " that the lands now occupied by the Cherokee Nation shall be secured to the whole Cherokee people for their common use and benefit, and a patent shall be issued for the same." So, too, by treaty with the Choctaws of September 27, 1830, 7 Stat. 333, granting a portion of the Indian Territory to them, the United States (Art. 4) secured to the " Choctaw Nation of Red People the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have the right to pass laws for the government of the Choctaw Nation of Red People and their descendants, and that no part of the land granted shall ever be embraced in any Territory or State; but the United States shall forever secure said Choctaw Nation from, and against, all laws except such as from time to time may be enacted in their own national councils, not inconsistent," etc. And in a treaty of March 24, 1832, 7 Stat. 366, with the Creeks (Art. 14), the Creek country west of the Mississippi was solemnly guaranteed to these Indians, " nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them."

Under the guaranties of these and other similar treaties the Indians have proceeded to establish and carry on independent governments of their own, enacting and executing their own laws, punishing their own criminals, appointing their own officers, raising and expending their own revenues. Their position, as early as 1855, is indicated by the following extract

from the opinion of this court in *Mackey* v. *Cox*, 18 How. 100; 103 :

" A question has been suggested whether the Cherokee people should be considered or treated as a foreign state or territory. The fact that they are under the Constitution of the Union, and subject to acts of Congress regulating trade, is a sufficient answer to the suggestion. They are not only within our jurisdiction, but the faith of the nation is pledged for their protection. In some respects they bear the same relation to the Federal Government as a Territory did in its second grade of government under the ordinance of 1787. Such Territory passed its own laws, subject to the approval of Congress, and its inhabitants were subject to the Constitution and acts of Congress. The principal difference consists in the fact that the Cherokees enact their own laws, under the restriction stated, appoint their own officers, and pay their own expenses. This, however, is no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other Territories in the Union. It is not a foreign, but a domestic territory — a Territory which originated under our Constitution and laws."

Similar language is used with reference to these Indians in *Holden* v. *Joy*, 17 Wall. 211, 242. Under these circumstances it could scarcely be expected that the United States should be called upon to extinguish, for the benefit of a railroad company, which had chosen to locate its route through this Territory, a title guaranteed to the Indians by solemn treaties and which had been possessed by them for upwards of forty years with the powers of an almost independent government.

The terms of the second section of the land grant act indicate that nothing of this kind was contemplated. The United States did not agree to extinguish the Indian title absolutely but only " as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession." Whether an extinguishment of an Indian title at all was consistent with public policy and the welfare of the Indians could only be determined by Congress, or the execu-

tive officers of the Government; whether it could be obtained by voluntary cession could only be determined by the acts of the Indians themselves.

In *Buttz v. Northern Pacific Railroad*, 119 U. S. 55, wherein a grant to the Northern Pacific Railroad, with a similar provision for the extinguishment of Indian titles, was under consideration, it was held that, under the principal treaties applicable to that case, the grant operated to convey the fee to the company, subject to the right of occupancy by the Indians, but that the right of the Indians could not be interfered with or determined, except by the United States; that no private individual could invade it, and the manner, time and conditions of its extinguishment were matters solely for the consideration of the Government, and were not open to contestation in the judicial tribunals. It appeared in that case that the United States had full title to the lands, subject to a mere right of occupancy on the part of the Indians.

With respect to the power of the United States to extinguish the Indian titles, it was observed in *Beecher v. Wetherby*, 95 U. S. 517, 525: "It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians. with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom derives title from the Indians."

The railroad company was in no position to insist that the Government should extinguish these titles, at least without affirmatively proving that the Indians were willing to make the cession, and that it was consistent with public policy and their own general welfare to permit them to do so. It made the Government its arbiter in this particular. Indeed, it is doubtful if the engagement of the Government amounted to anything more than an expression of its willingness to assist the company in acquiring Indian titles, if the company could per- suade the Indians to relinquish such titles, and the Government

considered it consonant with their welfare to do so.  The stipulation should be read in connection with the seventeenth section of the act which authorized the company to accept grants from "any Indian tribe or nation through whose reservation the road herein provided for may pass," provided that any such grant or donation, power, aid or assistance from any Indian tribe or nation should be subject to the approval of the President of the United States.  This proviso is obviously inconsistent with any general undertaking on the part of the Government to extinguish all Indian titles.  That it required the United States absolutely and at all hazards to extinguish such titles, and to take from the Indians a strip of land forty miles in width through the entire Territory, and open it to settlement, is not only inconsistent with their treaties and with their agreement with the company, but one which involved a grave disturbance, if not practically the upsetting of a long established Indian government.  In fact, Congress promised nothing in this particular from which the company could claim a legal breach of their agreement, without at least showing that the Indians were willing to cede that portion of their territory, and that public policy and their own welfare required this to be done.

Plaintiff admits that there was a reserved discretion in the Government as to the circumstances under which the Indian titles should be extinguished, but insists that, so long as that discretion was exercised and performance withheld, the Government was in no position to assert a right of forfeiture — in other words, that so long as fulfilment by the company remained impossible, by reason of the failure of the Government to keep its promises, no matter for what reason, the power to insist upon performance by the railroad was postponed.  We consider this construction of the compact unsound. The railroad company took its chances with the Government in this particular.  The latter might not deem it sound policy or for the welfare of the Indians to extinguish their title, or it might not procure their assent.  Under neither contingency would the company have the right to complain nor to set up this non-performance as a defence to its own failure to build

the road. Knowing the title under which the Indians held this territory, the company should, when it contemplated the construction of the road, have obtained some positive assurances from the Indians that they would permit the road to be built. It seems that by treaties made in 1866 with the Seminoles, the Choctaws and Chickasaws, the Creeks, the Delawares and the Cherokees, 14 Stat. 755–799, provision was made for a right of way for certain railways from north to south, and from east to west, through the Indian Territory ; but the very fact that these treaties made no provision for a grant of lands to the railways through this Territory as appurtenant to their line of road was notice to the companies that no such grant was contemplated. Indeed, these very treaties made additional provisions for the exercise of legislative power by the several Indian nations, and contained additional guaranties for their legislative independence and self-government — guaranties quite inconsistent with a grant to the railway of alternate sections of land forty miles in width, and the opening of the other alternate sections to purchase as public lands. All of these treaties were entered into prior to the land grant act of July 27, 1866; and both parties must have had them in view at that time.

4. The defence that other reservations were made to these Indians after this act was passed stands upon a somewhat different basis. So far as these Indian reservations were in the Indian Territory they are immaterial, since we have already held that lands in that Territory did not pass, and it could make no difference whether they were reserved for one tribe or another. Of the reservations in New Mexico and Arizona most of them were made after July 4, 1878, the time fixed for the completion of the road, and at a time when the Government had a right to declare the grant forfeited. All these reservations, too, were made opposite portions of the road which were actually built, and cannot be made available as an excuse for not completing the other portions. None of them seem to affect in any way the lands coterminous with the unconstructed portion. There was no restriction upon the right of the Government to dispose of public lands in any way

it saw fit prior to the filing of the map of definite location; and if it assumed to dispose of lands within the grant, after the rights of the railroad company had attached, such action might be void, but it would be no answer to the obligation of the company to complete its road within the stipulated time. Some of these reservations, too, were made in pursuance of treaties made with the Indians prior to the land grant act, and were apparently made in pursuance of a plan to confine the Indians within designated boundaries of territories previously occupied by them. These reservations did not seem to have seriously interfered with the company in the prosecution of its work, or, with the exception of those in the Indian Territory, to have been seriously insisted upon as an answer to the proposed forfeiture of its land grant.

5. It is finally contended that the Government failed to fulfil its obligation to survey the lands, and that this was a condition precedent to its right to declare a forfeiture. This obligation is contained in the sixth section in the following language: "That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad." Evidently the failure to do this did not prevent the company from realizing the full value of the land granted by mortgaging the road, and it is open to doubt whether it could, under any circumstances, be insisted upon as a defence to the forfeiture. It is true that the railroad company offered to furnish the money for such surveys, and that the United States refused to accept it; but such offer was not made until 1881, three years after the time stipulated for the completion of the road, and at a time when the Government had a right to treat the land grant as forfeited, although the act of forfeiture was not passed for five years thereafter.

Upon the whole it does not seem to us that Congress exceeded its powers in forfeiting this grant. The plaintiff company seems to have undertaken its great enterprise in building a transcontinental railroad without adequate appreciation of

the difficulties to be surmounted, which finally caused a total suspension of its work; and, when in 1880, after the panic of 1873 had spent its force, it resumed operations, the time had already expired for the completion of the road, and it was only by the inaction or indulgence of Congress that it was permitted to proceed. So far as the road was built and accepted by the Government after that time, it was probably entitled to receive its appropriate land grant, but this was rather a matter of favor than of strict right. During this long period, from 1871 to 1880, it should, under its charter, have constructed at least fifty miles per year, and should have completed the whole road by July 1, 1878. But it did nothing. After this long inaction of nine years and its practical abandonment of the work, the company was not in a position to demand of the Government a strict and literal performance of its obligations when it had so completely failed to meet its own. While the reservation of some of these lands for the benefit of the Indian tribes might not have been consistent with its obligations to extinguish Indian titles, if the company had been prosecuting its work according to its contract, we do not think that it is entitled to complain that the Government did not deal with it precisely as if it lived up to its undertaking.

The judgment of the court below must, therefore, be

*Affirmed.*

MR. JUSTICE GRAY was not present at the argument and took no part in the decision of this case.