Dennis CARLSON, et al., Plaintiff,

v.

**VILLAGE OF UNION CITY, MICHIGAN, et al., Defendants.**

No. K83–243 CA.

United States District Court, W.D. Michigan, S.D.

Jan. 29, 1985.

802

James D. O'Connell, O'Connell & Wayne, Highland Park, Mich., for plaintiff.

Mark W. Garrison, Tuck & Garrison, Albion, Mich., for defendants.

OPINION

BENJAMIN F. GIBSON, District Judge.

■ In April of 1981, the Village of Union City granted to St. Joseph Valley Cablevision a franchise, giving St. Joseph the right to build, operate, and maintain a cable television system within the village.[1] The franchise was non-exclusive and had a term of 15 years.

In April of 1983, after notice and a hearing, the trustees of the village revoked the franchise. By that time, plaintiff, the owner of St. Joseph Valley Cablevision, had expended considerable sums to string cable and erect facilities necessary for the transmission of the cable television signal. Under the terms of the franchise, plaintiff had six months to remove his equipment before the equipment would be considered transferred and assigned to the village.

Plaintiff alleges that the village revoked the franchise as a result of a conspiracy between Union City, the village trustees, and unknown others, to prevent plaintiff from providing cable television service. Defendants, the village and its individual trustees, claim that the franchise was revoked because plaintiff failed to install the system within the timetable provided in the franchise agreement. Specifically, defendants claim that, after a period of two years, plaintiff had yet to provide service to any residences within the village.

Plaintiff has claimed violations of the first amendment, the equal protection clause, the takings clause of the fifth amendment, the contracts clause, and section one of the Sherman Act. Pendent to his federal claims, plaintiff has raised several state law claims, most notably a breach of contract claim.

Defendants have moved for summary judgment on all federal claims. In the event the Court grants summary judgment on the federal claims, defendants have moved for dismissal of the pendent state claims for lack of jurisdiction. As discussed below, the Court finds merit in defendants' arguments and grants summary judgment and dismissal.

## I. THE ANTITRUST CLAIM

Plaintiff alleges that defendants consulted with potential competitors of St. Joseph Valley Cablevision and conspired to take over the facilities of St. Joseph's. He claims that defendants intended to prevent him from providing cable television service to the franchise territory and to arrange for one of his competitors, or Union City itself, to monopolize the business of providing cable television service in the Village of Union City and surrounding areas. Plaintiff claims that defendants revoked his franchise for an anti-competitive purpose and with an anticompetitive effect. He characterizes defendants' conduct as an unreasonable restraint of trade, a group boycott, and a concerted refusal to deal.

Defendants have moved for dismissal, claiming that they are immune from federal antitrust liability under the "state action" doctrine. The Court finds this argument convincing and accordingly grants summary judgment on the antitrust claims.

The state action exemption was first addressed by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The state of California had adopted a program for the marketing of its raisin crop that restricted production and marketing of raisins. Faced with conflicting state and federal law, the Court concluded that Congress had not intended for the Sherman Act to restrict the actions of the sovereign states. Thus, the Court held that the state marketing program was immune from the force of the federal antitrust laws. 317 U.S. at 350–51, 63 S.Ct. at 313–14.

---

1. Defendants have claimed that, because plaintiff never signed the franchise agreement, there is no contract. For the purpose of this motion, the Court has assumed, in the plaintiff's favor, that such a contract existed.

The franchise was granted and revoked by means of village ordinances. An ordinance may have both the effect of a legislative act and a contract between parties. *See Flint and Fentonville Plank-Road Co. v. Woodhull*, 25 Mich. 99, 101–02 (1872).

In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), a plurality of the Court held that the immunity accorded to actions of states is not automatically extended to actions of municipalities. Expressing concern that a "serious economic dislocation" could result if cities were free to place their own parochial interests above the nation's economic goals, 435 U.S. at 412–13, 98 S.Ct. at 1136–37, the plurality held that actions of municipalities should not receive the same deference accorded state activity. Instead, *Parker* immunity should only be granted when a municipality engages in conduct "pursuant to state policy to displace competition with regulation or monopoly public service." 435 U.S. at 413, 98 S.Ct. at 1137. Further, to qualify for immunity, the state policy pursuant to which the municipality acts must be one that is "clearly articulated and affirmatively expressed." 435 U.S. at 410, 98 S.Ct. at 1135.

The Supreme Court has recently considered the state action immunity doctrine in the context of a municipality's regulation of cable television. In *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), a cable television operator sued the City of Boulder for enacting a three month moratorium on cable television development. The City argued that, because it was acting pursuant to the home rule powers conferred upon it by the state constitution, it was entitled to *Parker* immunity.[2] The Court held that the home rule provision did not satisfy the "clear articulation and affirmative expression" standard and described Colorado's policy as one of "mere

neutrality" respecting the municipal actions challenged as anticompetitive. Thus, the Court concluded that the *Parker* immunity doctrine did not apply.

Defendants argue that the facts of the present case are distinguishable from those of *Boulder*. Instead of asserting home rule powers as the basis for their actions, defendants suggest that article 7, section 29, of the Michigan Constitution provides the "clearly articulated and affirmatively expressed" state policy required. Article 7, section 29, provides that:

No person, partnership, association or corporation, public or private, operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other utility facilities, without the consent of the duly constituted authority of the county, township, city or village; or to transact local business therein without first obtaining a franchise from the township, city or village. Except as otherwise provided in this constitution the right of all counties, townships, cities and villages to the reasonable control of their highways, streets, alleys and public places is hereby reserved to such local units of government.

As the Sixth Circuit has recently noted, the Supreme Court's *Boulder* opinion left open two critical questions. *Hybud Equipment Corp. v. City of Akron*, 742 F.2d 949 at 959 (6th Cir.1984). First, although the Court made clear that home rule powers alone were insufficient to invoke the *Par-*

---

**2.** Article 20, section 6 of the Colorado Constitution provides that:

The people of each city or town of this state, having a population of two thousand inhabitants ... are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.
Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

. . . . .

It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters. . . .
The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters.
See *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 43 n. 1, 102 S.Ct. 835, 836 n. 1, 70 L.Ed.2d 810 (1982).

*ker* exemption, it did not describe what degree of specific statutory authorization would be necessary. Second, it did not resolve a question raised by previous cases—whether a municipality's actions must also satisfy a test of "active state supervision" to qualify for immunity. Both of these issues are raised in the present case.

### A. Clearly articulated and affirmatively expressed

The Supreme Court has only vaguely outlined the contours of its "clearly articulated and affirmatively expressed" standard. In *Lafayette,* the plurality noted that its holding did not mean that "a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense." Rather, the actions of the municipality will be immune when a court finds from the authority given the municipality to operate in a particular area "that the legislature contemplated the kind of action complained of." 435 U.S. at 415, 98 S.Ct. at 1138. In *Boulder,* a majority of the Court adopted the analysis of the *Lafayette* plurality and emphasized that the legislative directive must be more than a merely neutral expression of state policy respecting the actions challenged as anticompetitive. 455 U.S. at 48–50, 55, 102 S.Ct. at 839–40, 842.

The Sixth Circuit has, to some extent, focused the inquiry under the "clearly articulated" standard. In its application of the doctrines enumerated in *Lafayette* and *Boulder,* the Sixth Circuit has held that a municipality is acting pursuant to a "clearly articulated and affirmatively expressed" state policy if its actions are a "reasonable and foreseeable exercise of delegated powers within the scope of an agency's authority." *Hybud Equipment Corp. v. City of Akron,* 742 F.2d 949 at 960 (6th Cir.1984). Thus, in this case, the Court must decide whether Union City's revocation of plain-

tiff's cable television franchise resulted from a "reasonable and foreseeable exercise" of the powers delegated to Union City by article 7, section 29, of the Michigan Constitution.

■ The first issue to be resolved is whether cable television is a "public utility" within the meaning of section 29. The Michigan Court of Appeals has specifically held that it is. *Meridian Township v. Roberts,* 114 Mich.App. 803, 319 N.W.2d 678, *amended,* —— Mich.App. ——, 324 N.W.2d 339 (1982). This Court will defer to the state court's interpretation of its own constitution. *See Community Communications Co. v. City of Boulder,* 455 U.S. 40, 52–53 nn. 15 & 16, 102 S.Ct. 835, 841–42 nn. 15 & 16, 70 L.Ed.2d 810 (1982); *Euster v. Eagle Downs Racing Assn.,* 677 F.2d 992, 996 n. 6 (3d Cir.), *cert. denied,* 459 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982).

Given that cable television is a public utility governed by section 29, the next question to be resolved is whether that section provides a "clear articulation and affirmative expression" of state policy regarding the acts of which plaintiff complains. An understanding of the history and purpose of article 7, section 29, is necessary to the resolution of that issue.

Article 7, section 29, of the Michigan Constitution [3] was intended to provide local governments with the power to reasonably regulate the use by public utilities of highways, streets, alleys, and other public places. The committee that proposed section 29 explained to the delegates at the 1908 constitutional convention that:

[t]his is a new section, and its purpose is to prevent the use of streets, alleys, highways, and public places without the consent of the local authorities first had and obtained. The word "reasonable" was inserted to place a limitation upon the authority cities, villages and townships may exercise over the streets, alleys, highways, and public places within their corporate limits. And it was point-

---

**3.** Article 7, section 29, of the current constitution was derived from article 8, section 28, of the 1908 constitution. The history detailed here is that of the original version of the provision in the 1908 constitution.

ed out in the debates that without the word "reasonable," or a similar qualification, the section would practically deprive the State itself of authority over its highways and public places.

*See People v. McGraw*, 184 Mich. 233, 237, 150 N.W. 836 (1915).

The history of section 29 and the Michigan case law interpreting it suggest that the delegates to the convention did not contemplate that section 29 gave local governments the power to grant monopoly powers to public utilities. In a 1928 opinion, the Michigan Attorney General responded to the question whether a township had the power to grant an *exclusive* franchise for the use of the township's highways for the transmission and distribution of electric power. 1929–30 Op.Att'y Gen. p. 62 (Aug. 20, 1928). The Attorney General considered the constitutional provision in light of Michigan case law and concluded that section 29 did not provide a municipality with the power to grant an exclusive franchise. He noted that Act No. 106 of the Public Acts of 1909, MICH. COMP.LAWS ANN. §§ 460.551–.559 (1967) (current version), reserved for the state considerable responsibility for the regulation of the electric utilities. Thus, the power granted to municipalities was limited to the "reasonable" regulation of local streets and highways; an exclusive franchise, the Attorney General opined, was not "reasonable." *See* MICH.COMP.LAWS ANN. § 460.553 (1967) ("nothing herein contained shall be construed to impair any right possessed by any village or township to the *reasonable control* of its streets, alleys

and public places *in all matters of mere local concern*") (emphasis supplied).[4]

Even if section 29 was not adopted in contemplation of grants of *monopoly* power, the very fact that section 29 requires a utility to obtain a franchise from a municipality before transacting local business suggests that *some* anticompetitive restraints were contemplated. *See Century Federal v. City of Palo Alto*, 579 F.Supp. 1553, 1557 (N.D.Calif 1984) ("the word 'franchise' connotes a certain degree of exclusivity"). *Cf. Hopkinsville Cable TV, Inc. v. Pennyroyal Cablevision, Inc.*, 562 F.Supp. 543, 546 (W.D.Ky.1982) (concluding that a similar local franchise provision of the Kentucky constitution gave municipalities the power to grant *monopoly* power).

Moreover, it would appear that article 7, section 29, gives local governments the authority, for reasons of safety and aesthetics, to restrict the number of utility poles erected, the number of wires strung, and the manner in which those wires are strung. The pleadings and affidavits of this case suggest that safety concerns were partially responsible for the dispute between plaintiff and defendants. The affidavit of James Spencer, the Village Superintendent, states that, in his opinion, at least fifty percent of the cabling done by plaintiff was in violation of applicable codes and regulations. Further, he avers that there have been several instances in which persons driving trucks or other large vehicles have struck cables strung by plaintiff. Nothing in the record contradicts the evidence that one of the purposes of the franchise agreement was to set safety standards to govern plaintiff's operation.[5]

---

**4.** It appears that, because of the small population of the village of Union City and because of the nature of the service, the cable television market in the village may well be a natural monopoly. *See Lamb Enterprises, Inc. v. Toledo Blade Co.*, 461 F.2d 506, 511–15 (6th Cir.), *cert. denied*, 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972); *White v. Ann Arbor*, 406 Mich. 554, 575–77, 281 N.W.2d 283 (1979) (Moody, J., concurring); 1973–74 Op.Att'y Gen. No. 4808 p. 130, 134 n. 2 (April 25, 1974). Thus, even if article 7, section 29, only authorizes the grant of non-exclusive franchises, it is "reasonable and foresee-

able" that only one such franchise would be granted for each type of public utility.

**5.** The Court notes that the franchise agreement between Union City and St. Joseph's Cablevision goes further than merely establishing safety specifications for the stringing of cable. For example, it sets forth the rates to be charged customers, channels to be carried, and specifications for the quality of signal to be provided. It also requires plaintiff to pay an annual franchise fee and to provide broadcasting equipment for use by the village. These provisions are not directly related to the village's control of

The Court concludes that the power granted to municipalities through article 7, section 29, satisfies the requirements of the "clearly articulated and affirmatively expressed" standard. Although it does not appear that those who ratified section 29 contemplated grants of monopoly power, it does appear that they contemplated regulation that would have an anticompetitive effect. *See City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978) (actions of municipality will be immune if they are taken "pursuant to a state policy to displace competition with regulation *or* monopoly public service") (emphasis supplied).

The act of which plaintiff complains is defendants' revocation of his franchise. A revocation such as that which occurred in this case is the reasonable and foreseeable consequence of the authority delegated to Union City by article 7, section 29, of the Michigan Constitution. That provision grants to Union City the right to control the use of its highways and public ways. It gives the village the right to grant, and implicitly gives the right to revoke, franchises for use of the public ways, subject to the limitation that such actions must be reasonable. *See People v. McGraw*, 184 Mich. 233, 150 N.W. 836 (1915). Union City has acted pursuant to this grant of power and, therefore, the "clearly articulated and affirmatively expressed" standard of *Boulder* and *Lafayette* is satisfied.

### B. Active government supervision

█ When private parties claim the benefit of the state action exemption, they are required to show active state supervision of the challenged restraint. For example, in *California Retail Liquor Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court held that price restraints established by wine wholesalers pursuant to a state statute were not exempt from antitrust scrutiny. Although the state statute authorized the activity, the Court held that active state government supervision of the regulatory scheme was required in order for the program to fall under the state action exemption. 445 U.S. at 104–06, 100 S.Ct. at 942–44.

In *Boulder*, the Supreme Court left open the question whether the active government supervision requirement applies when local governments, rather than private parties, seek the protection of the state action doctrine. The Sixth Circuit considered this question in *Hybud Equipment Corp. v. City of Akron*, 742 F.2d 949 (6th Cir.1984), a case involving a state agency. The court concluded that the issue of state supervision should be considered as part of the general inquiry into whether the agency's actions are to be considered actions of the state. *Id.* at 964.

Although, in Michigan, cable television is not subject to supervision by a state agency,[6] this Court finds significant that the state does extensively regulate other public utilities. *See, e.g.,* MICH.COMP.LAWS ANN. §§ 460.1–.848 (1967 & Supp. 1983) (powers granted to the Michigan Public Services Commission). The Court assumes that, because the legislature has provided for oversight of the activities of public

---

its highways and public ways. Given that article 7, section 29, permits a village to restrict the number of franchises granted, it appears to the Court that these collateral provisions reflect proper considerations in the village's determination of to whom those limited franchises should be granted. *See Meridian Township v. Roberts*, 114 Mich.App. 803, 319 N.W.2d 678, *amended* — Mich.App. —, 324 N.W.2d 339 (1982) (which appears to interpret article 7, section 29, as giving municipalities the power to enter into such franchise agreements).

**6.** The Michigan Public Services Commission has determined that it does not have jurisdiction over the cable television industry. *City of Jackson v. Michigan Bell Telephone Co.*, 63 PUR3d 384 (Mich. Public Service Comm'n, 1966); *see White v. Ann Arbor*, 406 Mich. 554, 564 n. 2, 281 N.W.2d 283 (1979); *Perlongo v. Iron River TV*, 122 Mich.App. 433, 436, 332 N.W.2d 502 (1983); *see generally RAM Broadcasting of Michigan, Inc. v. Michigan Public Service Comm'n*, 113 Mich.App. 79, 85–86, 317 N.W.2d 295 (1982) (the Michigan Public Service Commission has no broad grants of power; rather, its jurisdiction is grounded on specific statutory grants of authority).

utilities in general, it will similarly provide for oversight of the cable television industry if it determines that further supervision is required.

Moreover, the state legislature provided for some supervision by narrowly tailoring its grant of authority to the municipalities. Article 7, section 29, only authorizes local governments to "reasonably" control the use of highways and public ways. Thus, the state courts, in some sense, act as the ultimate "supervisors" of the activities of the municipalities. If the conduct of the municipality is not reasonably related to a legitimate local concern, a state court could find the municipality to be acting outside the scope of authority conferred by article 7, section 29. *See People v. McGraw*, 184 Mich. 233, 150 N.W. 836 (1915); 1929–30 Op.Att'y Gen. p. 62 (Aug. 20, 1928).

■ Thus, the Court finds that the State of Michigan does, to some extent, supervise the issuance and revocation of cable television franchises by local governments. To the extent the supervision factor is to be considered in addition to the "clearly articulated" standard, it merely reaffirms the Court's conclusion that Union City's revocation of plaintiff's franchise was pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation.

## II. THE FIRST AMENDMENT CLAIM

Plaintiff claims that, as a cable television operator, he is entitled to first amendment protection. He contends that, by passing an ordinance revoking his franchise, defendants intended to and did in fact preclude him from disseminating news, information, entertainment, and ideas. He also claims that defendants revoked his franchise expressly in order to provide the opportunity for a different cable television operator to "speak" to the village residents.

■ There is no doubt that cable television operators are entitled to protection under the first amendment. *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 127 (7th Cir.1982); *Community Communications Co. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir.1981), *cert. denied*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982) [hereinafter cited as *Boulder II*]; *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Their first amendment rights, however, are not unlimited.

Defendants contend that their revocation of plaintiff's franchise was not an attempt to regulate the *content* of plaintiff's speech and, for that reason, did not infringe plaintiff's first amendment rights. Plaintiff argues that, by revoking his franchise, defendants have indeed regulated the content of his speech—to the extent of completely stifling it.

■ The Court has concluded that, although the revocation of plaintiff's franchise *affected* plaintiff's speech, its primary purpose was to regulate non-speech elements of plaintiff's conduct. The ordinance granting plaintiff the franchise dealt primarily with conditions regarding the installation of wires and construction of facilities for the cable system. The closest that the franchise agreement got to regulating the content of plaintiff's cable signal was in section 12, which required plaintiff to provide the minimum channels required by the F.C.C.[7] Because plaintiff had not yet begun to operate the cable system when his franchise was revoked, this arguably content-related provision could not have been the basis for that revocation. Thus,

---

**7.** Section 12 of the franchise agreement provides that:

A. The Company shall comply with all rules and regulations of the F.C.C. with respect to the reception, carriage, and distribution of signals.

B. Minimum channel complement shall include all V.H.F. channels significantly viewed, public, community, and education channels as required by the F.C.C.

C. The Company shall transmit and deliver over Village channels the signals designated therefore by the Village council at such times as the Village Council shall determine.

judging the ordinances granting and revoking plaintiff's franchise on their faces, the Court concludes that both were attempts to regulate non-speech conduct, not to regulate the content of plaintiff's speech.

Plaintiff has claimed that, irrespective of what the franchise agreement says, defendants revoked his franchise with a *purpose* of stifling the content of his broadcast signal and favoring the content that would be provided by another cable operator. Although there is no evidence before the Court regarding defendants' purposes in revoking plaintiff's franchise, even if plaintiff could present such evidence, it would not be relevant. When the village trustees revoked plaintiff's franchise, they did not give their reasons. The Supreme Court has noted, in the first amendment context, that inquiries into the purpose of legislative bodies is a hazardous undertaking. *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968). What may have been the purpose of one village trustee in voting for revocation may be entirely different than the intent that motivated another. Thus, this Court will go no further than to conclude that plaintiff's franchise was revoked pursuant to the terms of the original franchise agreement, which regulated only non-speech aspects of defendant's conduct. *Compare Home Box Office, supra* at 48 (purpose of FCC regulation was content-neutral) *with Berkshire Cablevision v. Burke*, 571 F.Supp. 976 (D.R.I.1983) (public access regulations affect operators' editorial discretion and, therefore, are not content-neutral).

■ Because the control that Union City has attempted to exert over plaintiff's cable television system is content-neutral, the test for this Court to apply to decide whether there has been a first amendment violation is that set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Defendants' revocation of plaintiff's franchise will pass first amendment scrutiny if: 1) it furthers substantial governmental interests; and 2) the incidental restriction of free expression is no greater than is essential to the furtherance of those interests. *Id.* at 377, 88 S.Ct. at 1679; *see also Home Box Office, supra* at 48.

■ The weightiest governmental interest in this case is Union City's interest in controlling plaintiff's use of the village streets and village-owned utility poles for the laying and stringing of cable. Many courts have recognized that municipalities have substantial interests in controlling disruptive use of the public domain by cable television operations. *Boulder II, supra* at 1377; *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 127 (7th Cir.1982); *Century Federal, Inc. v. City of Palo Alto*, 579 F.Supp. 1553, 1564–65 (N.D.Calif.1984); *Berkshire Cablevision v. Burke*, 571 F.Supp. 976, 985 (D.R.I.1983). *Compare Community Communications Co. v. City of Boulder*, 630 F.2d 704, 712 (10th Cir.1980) (Markey, C.J., dissenting) (because cable operator contracted with utility to deliver signal, city had no substantial interest in preventing disruption of the public domain), *rev'd on other grounds*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Greater Fremont, Inc. v. City of Fremont*, 302 F.Supp. 652, 662 (N.D.Ohio 1968) (franchise agreement was not a legitimate exercise of police power where cable operator was not attempting to erect its own distribution system and was, therefore, not disrupting the public domain). In this case, the village's interest in controlling use by plaintiff of its public ways is expressly countenanced by article 7, section 29, of the Michigan Constitution.

■ Because it appears that the cable television industry in the Village of Union City is a natural monopoly,[8] the village also

---

**8.** Both parties have conceded that the cable television industry in Union City has the characteristics of a natural monopoly. Defendant has indicated that, "although plaintiff was granted a non-exclusive franchise, the size of the municipality (the Village of Union City consists of between 600 and 700 residences) effectively discourages any other cable companies from attempting to compete with a franchise holder."

has an interest in ensuring that the one cable operator who supplies cable service to the village does so in a manner that serves the public interest. In *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court justified regulation of the broadcasting industry on the grounds that there is a "physical scarcity" of radio frequencies and, therefore, a physical limitation on the number of people who can "speak" through the media of television and radio. Under those circumstances, the Court held, governmental regulation in the public interest that has an incidental effect of limiting the first amendment exercise of the broadcasters is permissible.[9] A number of courts have, to some extent, extended this theory to circumstances where economic, rather than physical, scarcity has limited the number of cable television "speakers" in a given area.[10]

In *Boulder II*, the City of Boulder argued that "cable broadcasting is a monopolistic industry because it is not economically viable for more than one cable company to operate in any given geographic area." The Court concluded that, "when faced with a request for a license from a cable operator, government ... must be permitted to deal with the effects of the scarcity that may attend the use of the license it is about to issue. That is, government must have some authority in such a context to see to it that optimum use is made of the cable medium in the public interest." *Id.*

at 1379. *See also Berkshire Cablevision v. Burke*, 571 F.Supp. 976, 986–87 (D.R.I. 1983).

Although some courts have questioned whether economic scarcity alone may justify governmental intervention that limits first amendment exercise, *see Home Box Office, supra* at 46, that question need not be resolved in this case. Here, as discussed above, the weightiest governmental interest is in preventing disruption of the public domain. The need to regulate in the face of economic scarcity serves merely to buttress the village's primary interest.

Given that Union City has a substantial interest in regulating the activities of plaintiff's cable operation, the Court must next consider whether the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). In this case, the means that the village chose to restrict plaintiff's activities was the franchise agreement. That agreement set forth specifications for construction and operation of plaintiff's cable television system and, apparently following the guidelines of the F.C.C., *see* 47 C.F.R. § 76.31 & note following (1983), established a timetable for construction of the system.[11] It provided for revocation if the company violated any terms of the agreement and continued to do so thirty days after having been notified in writing of such violation.[12]

Defendant's Brief at 10. Plaintiff agreed with this statement. Plaintiff's Brief at 21.

**9.** Defendants do not argue that the facts of this case support a theory of physical scarcity. Although the capacity of the village's utility poles to safely support television cables may at some point be limited, no one has suggested that the poles could support only one such cable.

**10.** In a number of the reported decisions, the courts have limited their reliance on a theory of "economic scarcity" expressly because it was not clear whether, on the facts of that particular case, cable television was indeed functioning as a monopoly. In this case, that fact is not in dispute.

**11.** Parts A and B of section 16 of the franchise agreement provide that:

A. The Company shall extend the installation of cables, amplifiers, and related equipment throughout the Village as rapidly as is practicable.

B. Within one (1) year from the date of certification from the F.C.C., the Company shall be capable of providing "Basic Service" on a regular basis to at least twenty-five percent (25%) of the Village residences, within 18 months of the date of certification to 100% of the Village residences....

**12.** Section 3 of the franchise agreement provides that:

A. If the Company should violate any of the terms, conditions or provisions of this Ordinance, or if the Company should fail to comply with any reasonable provisions of any ordinance of the Village or F.C.C. regulations,

The franchise agreement was a reasonable means for the village to control plaintiff's use of the public ways and the village's utility poles. *See Berkshire Cablevision v. Burke*, 571 F.Supp. 976, 985 (D.R.I.1983). The agreement was narrowly tailored to support the interests of the village without unduly interfering with plaintiff's first amendment rights. As discussed above, no portion of the franchise agreement arguably relevant to this lawsuit attempted to control the content of plaintiff's speech. *See Id.* at 986 (courts must carefully scrutinize regulations controlling the cable industry to ensure that operators are not being regulated because public officials disapprove of their views).

It appears from the pleadings in this case that defendants revoked plaintiff's franchise because plaintiff did not comply with the timetable for construction. It is not important, however, for this Court to establish exactly why the franchise was revoked. The original franchise agreement, including the revocation clause, was narrowly tailored and only incidentally limited the content of plaintiff's speech. As such, it did not violate plaintiff's first amendment rights. When the village revoked plaintiff's franchise, it acted pursuant to the revocation clause of the original franchise. Thus, although plaintiffs are not precluded from seeking a remedy in contract for wrongful revocation, their first amendment rights have not been infringed. Accordingly, summary judgment is granted on plaintiff's first amendment claim.

### III. THE EQUAL PROTECTION AND SECTION 1981 CLAIMS

Plaintiff claims that defendants revoked his franchise in order to preclude him from exercising his free speech rights, in favor of the "speech" of another cable television operator. Plaintiff argues that this conduct violates his rights under 42 U.S.C. § 1981 and the equal protection clause of the fourteenth amendment.

Plaintiff has not alleged that defendants discriminated against him on account of race. For that reason, his claim under 42 U.S.C. § 1981 must be dismissed. *See Glover v. Tower*, 700 F.2d 556 (9th Cir.1981), *aff'd on other grounds*, —— U.S. ——, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984); *Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir.1980).

By alleging that defendants revoked his franchise in order to preclude him from exercising his free speech rights, plaintiff appears to be suggesting that the Court should apply the strict scrutiny test to his equal protection claim. The Court has already concluded that plaintiff's first amendment rights were not infringed by defendants' revocation of his franchise. Moreover, the Court fails to understand how defendants could have treated plaintiff differently because of the "speech" element of his cable broadcast when, at the time they revoked his franchise, he had yet to transmit a signal into any residence in Union City. The Court concludes that defendants' treatment of plaintiff did not result from his assertion of a fundamental right and therefore concludes that the strict scrutiny test does not apply. *See Brown v. Alexander*, 718 F.2d 1417, 1423 (6th Cir.1983) (strict scrutiny test did not apply when court found there was no first amendment violation).

Absent any indication that plaintiff belonged to a suspect class or that he was treated differently because he was asserting a fundamental right, the constitutional inquiry under the equal protection clause is whether the challenged state action ration-

and should the Company continue to violate the same for a period of thirty (30) days after the Company shall have been notified in writing by the Village to desist from such violation, the Company may, at the Village's option, be deemed to have forfeited and annulled all the rights and privileges of this franchise grant.

B. Any franchise granted hereunder shall be subject to all applicable provisions of Village ordinances, any amendments thereto.
C. Any franchise granted hereunder shall be subject to all applicable state and federal laws, including rules and regulations established by the F.C.C.

ally furthers a legitimate state purpose or interest. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 55, 93 S.Ct. 1278, 1308, 36 L.Ed.2d 16 (1973); *Brown, supra* at 1423; *Parks v. Watson*, 716 F.2d 646, 654 (9th Cir.1983).

■ As discussed above in the context of plaintiff's first amendment claim, the revocation of his franchise rationally furthered Union City's interests in controlling the use of the public domain and ensuring that the cable system in Union City served the public interest. Accordingly, summary judgment is granted on the equal protection and section 1981 claims.

## IV. THE TAKINGS CLAIM

■ Plaintiff has claimed that the franchise granted him by defendants constituted a property right and that its revocation violated the takings clause of the fifth amendment as applied to state action by the fourteenth amendment. The Court holds that, although plaintiff's franchise was a property right, the right was circumscribed by conditions set forth in the franchise agreement. Thus, defendants' revocation did not amount to a "taking" of property, but was simply an exercise of a limitation inherent in the property grant.

■ Although franchises are considered property for purposes of the takings clause, *New York Electric Lines Co. v. Empire City Subway Co.*, 235 U.S. 179, 193–94, 35 S.Ct. 72, 76, 59 L.Ed. 184 (1914); *Lansing Township v. City of Lansing*, 356 Mich. 338, 374, 97 N.W.2d 128 (1959), this is not a case where a municipality granted an irrevocable franchise or a franchise for a term of years with no conditions for revocation. *See Benton Harbor v. Michigan Fuel & Light Co.*, 250 Mich. 614, 619–20, 231 N.W. 52 (1930) (holding that a corporation had vested property rights in a franchise that was granted for a term of thirty years and renewable for a like term). Instead, plaintiff's franchise contains an explicit revocation clause as well as several clauses that establish conditions subsequent, such as the provision establishing a timetable for installation of the cable system.

Defendants do not dispute that the franchise gave plaintiff *some* vested property rights, but they argue that those property rights are no broader than plaintiff's contractual rights. Thus, if they revoked the franchise pursuant to the terms of the franchise agreement, they claim there has been no taking. *See generally City of Paragould v. Arkansas Utilities Co.*, 70 F.2d 530, 533 (8th Cir.1934) (grants of special franchises are strictly construed in favor of public rights, and "[o]nly that which is granted in clear and explicit terms passes by a grant of property, franchise, or privilege in which the government or the public has an interest"), *cert. denied*, 293 U.S. 586, 55 S.Ct. 101, 79 L.Ed. 682 (1934).

Caselaw supports defendants' characterization of plaintiff's limited property rights. In *New York Electric Lines Co. v. Empire City Subway Co.*, 235 U.S. 179, 193–94, 35 S.Ct. 72, 76–77, 59 L.Ed. 184 (1914), the Supreme Court held that the City of New York did not "take" a utility company's property when it revoked a franchise pursuant to an *implied* condition that the company must use the franchise within a reasonable period of time. The Court noted that "when it is said that there is vested an indefeasible interest, easement, or contract right, it is plainly meant to refer to a franchise not only granted but exercised in conformity with the grant.... It is a tacit condition annexed to grants of franchises that they may be lost by mis-user or non-user." *Id.* at 195, 35 S.Ct. at 77. The facts of the case before this Court are even stronger than those presented in *New York Electric Lines;* defendants here have revoked plaintiff's franchise pursuant to an *express* revocation clause in the original franchise.

The Court concludes that plaintiff's vested property rights can be no broader than his contractual rights. Under the terms of the franchise agreement, defendants could revoke the franchise for violation by the plaintiff of any of the terms of that agree-

ment.[13] Plaintiff accepted the contractual limitations of the franchise when he entered into the agreement. He cannot now expand those rights by simply raising a federal constitutional claim.

■■■ Plaintiff could argue, however, that this Court should not resolve the takings claim until this or another court has determined whether defendants' revocation complied with the terms of the franchise agreement. The Court dismisses that argument for two reasons, one based on precedent, the other on policy.

In *Atlantic & Pacific Railroad Co. v. Mingus*, 165 U.S. 413, 17 S.Ct. 348, 41 L.Ed. 770 (1897), the Supreme Court considered the effect of revocation by the United States Congress of a land grant to the Atlantic & Pacific Railroad Company. The company was incorporated by an act of Congress authorizing it to construct a railroad from Springfield, Missouri, to the Pacific Ocean. The act granted to the railroad sections of land adjacent to the right-of-way.

As in the present case, the act contained a provision setting forth a timetable for construction: the company was to lay not less than fifty miles of track per year and was to complete the 2,267 miles of track by 1878. Also as alleged in the present case, the railroad failed to meet the timetable for construction. By 1878, the company had completed only 125 miles. As a result, Congress passed an act in 1886 forfeiting and restoring to the public domain all land adjacent to uncompleted portions of the main line of the railroad.

The railroad company maintained that Congress could not simply pass an act forfeiting the grant. Instead, it argued, Congress must instigate a legal proceeding to judicially determine "whether there had been a breach of a condition on the part of the grantee, and the legal effect of such breach, and also whether there has not been a breach on the part of the United States which would estop them from claim-

ing a forfeiture." *Id.* at 431, 17 S.Ct. at 352.

The Court held that the act of Congress revoking the grant was effective, noting that when a public body has made a grant, the grant may be revoked by *either* a judicial proceeding *or* a legislative act. *Id.* at 431, 17 S.Ct. at 352. Although plaintiff would have the right to challenge in a judicial proceeding the propriety of the revocation under the terms of the original grant, the effect of the revoking act was immediate—plaintiff was divested of title to the land.

Applying the analysis of *Atlantic & Pacific Railroad* to the current case, the Court concludes that it need not resolve the underlying contract claim in order to rule on the takings claim. The defendant village trustees, by legislative act, voted to exercise their revocation rights under the franchise agreement. For the purpose of this Court's analysis under the takings clause of the federal constitution, plaintiff was divested by that act of any franchise property rights he may have held.

Further, the Court cannot ignore the implications of a decision in plaintiff's favor. If this Court held that it must first decide the contract claim before resolving the federal takings claim, every time a governmental entity asserted a contractual right to revoke or forfeit, that entity would be dragged into federal court on a federal "takings" theory.

Logic suggests that, so long as defendants' revocation purported to be pursuant to the terms of the original franchise grant, there can be no "taking" of property. If *plaintiff* breached the franchise agreement, defendants had a right to revoke, and plaintiff was not deprived of any contractual right. If *defendants* breached the agreement, then plaintiff will receive his remedy under contract law. If he receives specific performance, in this case the right to hook his cable system up to the individual homes in the village, then he will not be deprived of property for purposes of

**13.** *See supra* note 12.

the fifth amendment. If he receives monetary relief, then he will not be able to argue, under the fifth amendment, that he was deprived of property without compensation. In any case, there simply is no viable takings claim. Accordingly, defendants' motion for summary judgment on the takings claim is granted.

## V. THE IMPAIRMENT OF CONTRACT CLAIM

Based on a similar analysis, the Court has concluded that plaintiff has not stated a claim for relief under article I, section 10, of the federal constitution, forbidding acts by public bodies that have the effect of impairing contractual rights of private parties.

The contract clause of article I, section 10, was intended to prevent states or municipalities from revoking previously granted contractual rights. *See Southern Bell Telephone & Telegraph Co. v. City of Meridan,* 154 F.Supp. 736 (S.D.Miss.1957). It does not, however, prevent a public body from revoking contractual rights on the grounds that "the contract [has] not been performed, or that any condition thereof, express or implied, [has] been broken." *New York Electric Lines Co. v. Empire City Subway Co.,* 235 U.S. 179, 194, 35 S.Ct. 72, 76, 59 L.Ed. 184 (1914). In *New York Electric Lines,* the Court held that plaintiff's contractual rights were not impaired when plaintiff failed to comply with an *implied* condition that it exercise its franchise rights within a reasonable period of time. Certainly the same analysis applies in a case such as that before the Court, where plaintiff's franchise contained a clause which *expressly* called for revocation if plaintiff did not comply with the timetable for construction of the cable system.

As in the case of the due process claim, once it is determined that the municipality had the right to revoke plaintiff's franchise, the revocation cannot be considered an impairment of contract. Whether the revocation was a proper exercise of the terms of the franchise is a question of state, not federal, law.

## VI. THE SECTION 1983 CLAIM

As discussed above, the Court has concluded that plaintiff's constitutional claims lack merit. Accordingly, plaintiff's claim for relief under 42 U.S.C. § 1983 for violation of his constitutional rights must be dismissed.

## VII. THE PENDENT STATE CLAIMS

The Court has granted summary judgment on all federal claims raised by plaintiff. Accordingly, the Court does not have pendent jurisdiction over the remaining state law claims, and those claims are dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1965).

## JUDGMENT

In accordance with the Opinion dated January , 1985, IT IS HEREBY ORDERED that the Court grants defendants' motion for summary judgment on Counts I through V of plaintiff's complaint. The remaining counts are dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED.