916 F.2d 713
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
TRIAD CATV, INC., Plaintiff-Appellant,
v.
THE CITY OF HASTINGS, Defendant-Appellee,
and
Americable International-Michigan, Inc., Intervenor
Defendant-Appellee.
 No. 90-1082.
 United States Court of Appeals, Sixth Circuit.
 Oct. 15, 1990.
 
 Before KEITH and RALPH B. GUY, Jr., Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Triad CATV, Inc. (Triad), appeals from the entry of summary judgment on its 42 U.S.C. Sec. 1983 claim to redress an alleged diminution of a property interest without procedural due process.[1] Because we reject Triad's contention that due process required the City of Hastings, Michigan (City), to determine the local market's capacity to support two cable television operators before granting a competing franchise to overbuild Triad's cable system,[2] we affirm.
 
 I.
 
 2
 On May 12, 1975, the City entered into an agreement with Barry Cable Corporation (Barry) for the construction and operation of a cable television system. The non-exclusive franchise specified maximum installation and service charges, and conditioned rate increases upon approval by the city council. By its terms, the contract ran for fifteen years, but granted Barry "the option to extend all terms and conditions of th[e] agreement for one additional fifteen (15) year period by giving written notice of its desire for such extension at least sixty (60) days prior to the termination date of the original term...." After Triad merged with Barry, Triad became the acknowledged successor to the franchise agreement. An August 27, 1979, amendment passed by the city council formally recognized Triad as the cable television operator under the franchise agreement. Thus, Triad obtained Barry's contractual right to extend the franchise for an additional fifteen-year term.
 
 
 3
 Triad sent a certified letter to the City on November 24, 1987, noting that the original franchise term was due to expire on May 12, 1990, and expressing the company's desire to exercise its contractual right to a fifteen-year extension. The letter further indicated that Triad planned to "submit a draft of the new Franchise that w[ould] be updated to include the changes brought about by the Cable Act of 1984." Triad subsequently furnished the City with a proposed agreement, prompting a November 3, 1988, response from the City scheduling a "special meeting ... for the purpose of discussing the proposed Franchise Agreement."
 
 
 4
 In January of 1989, the City conducted a public hearing concerning the quality of Triad's cable service.[3] Discussions at the hearing included various complaints from cable subscribers about the Triad system.[4] The City subsequently addressed Triad's proposed extension agreement in a letter dated March 8, 1989. The City's correspondence offered the following rationale for rejecting the proposal:
 
 
 5
 Regarding any changes that may have occurred in the Cable Act of 1984, the proposed Agreement that you submitted to the City of Hastings did not contain any changes. Additionally, the proposed Agreement provides for an automatic renewal under Paragraph 6 on Page 4.
 
 
 6
 Please be advised that the City of Hastings formally rejects this proposed Agreement for the reason that it does not intend to grant Triad an option to extend all of the terms and conditions in that Agreement for an additional 15 year period beyond this proposed 15 year extension.
 
 
 7
 As you know, should you resubmit a new Franchise Agreement to the City that does not contain a renewal clause, it would appear the City would have no choice but to approve it. Should you dispute the City of Hasting['] right to not grant an option for [an] additional 15 year renewal period, please direct any correspondence in that regard to [the city attorney]. (Emphasis added).
 
 
 8
 The City followed up this correspondence with a March 13, 1989, letter to Triad characterizing the company as "in default" on the existing franchise agreement due to deficiencies in the cable system identified at the January 1989 public hearing. The City cited a provision in the agreement allowing 90 days for Triad to remedy any default, and demanded that the company take action to address the cable customers' complaints.
 
 
 9
 Triad responded in a March 21, 1989, letter discussing both the rejection of its proposed extension agreement and the declaration of a default attributable to poor service. On the first issue, the company raised no objection to the City's position, promising that a "new renewal agreement will be submitted to you shortly ... containing no renewal clause, which should comply with your request...." On the issue of service quality, however, the company "requested that the default alleged be specifically stated so that Triad CATV can properly respond to said notice of default."
 
 
 10
 The City formally answered Triad's letter on April 17, 1989. Specifically, the City acknowledged receipt of the revised franchise extension agreement submitted by Triad and promised to present the proposal to the city council on April 24, 1989. With respect to the alleged flaws in the cable system, however, the City expressed its belief that Triad was well aware of the users' complaints and had exclusive access to the technical and financial information necessary to remedy the problems identified by the cable customers. Accordingly, the City could not provide any further guidance with respect to the users' complaints unless Triad furnished the City with "the technical information concerning the construction and operation" of the system "as well as all of [the company's] financial books and records[.]"
 
 
 11
 One month later, on May 17, 1989, Triad replied that the company "ha[d] not yet heard from [the City] regarding the revised franchise renewal following the meeting of April 24, 1989," nor had the company "received any indication as to the '90 day problem.' " Triad then detailed its understanding of the cable users' complaints and the steps the company had taken to resolve these concerns. Triad concluded the letter by demanding "approval of the franchise and a notice that the '90 day provision has been satisfied.' " Discussions between the City and Triad regarding the renewal and service quality issues apparently ensued, and Triad eventually wrote to the City on July 17, 1989, to clarify the positions of both sides.
 
 
 12
 The City ultimately set forth its positions concerning the disputes with Triad in a letter dated September 8, 1989. The City confirmed Triad's right to renewal, but raised continuing concerns about service in the following language:
 
 
 13
 [I]t is our position that Triad's franchise was automatically renewed by their notification to the City to so renew sent November 24, 1987, so we do not believe a new agreement is necessary. The franchise simply continues on the same terms as contained in the existing franchise agreement.
 
 
 14
 We still believe Triad is in default, with reference to the quality of its services, as previously outlined in our correspondence. We cannot supply the technical shortcomings of the system and/or its maintenance which are causing the problems, but we are still trying to find a consultant to analyze the system for us.
 
 
 15
 Besides expressing concerns about the quality of the Triad system, the letter concluded on what Triad perceived as an ominous note by indicating that the City had received a franchise proposal from another cable company which the City intended to consider "in the next few weeks."
 
 
 16
 Although the City ultimately formalized the extension of its franchise agreement with Triad for an additional fifteen-year term,[5] the City also opened negotiations with Americable International-Michigan, Inc. (Americable), to provide an alternative to the Triad system. Triad feared that the city council would grant Americable a competing franchise at a meeting on October 10, 1989, so the company filed this action against the City prior to the meeting and sought a temporary restraining order to block the award of a competing franchise. The district court reviewed Triad's claims that the City violated the Cable Communications Policy Act of 1984 and breached the 1975 franchise agreement, then issued a temporary restraining order, and eventually converted the TRO into a preliminary injunction.
 
 
 17
 After Triad submitted an amended complaint followed by a second amended complaint including a 42 U.S.C. Sec. 1983 procedural due process claim, Americable filed a motion for limited intervention and the City moved for summary judgment. The district court conducted a hearing on December 5, 1989, to address the various motions. The court granted Americable's motion to intervene, took the pending motion for summary judgment under advisement, and extended the preliminary injunction until December 22, 1989, to allow the court time to prepare a written resolution of the City's request for summary judgment. On December 21, 1989, the district court issued a memorandum opinion and order granting summary judgment for the City on Triad's federal claims, dismissing the pendent state claims without prejudice, and dissolving the preliminary injunction.[6] This appeal followed.
 
 
 18
 Triad argues on appeal, as it did in the district court, that the City's award of a competing franchise without a hearing to determine the impact of an overbuild on Triad's franchise constituted a violation of due process guaranteed by the fourteenth amendment. In granting summary judgment for the City, the district court reasoned that: (1) Triad had not suffered a deprivation of property; and (2) due process considerations did not compel the City to study economic feasibility before awarding a competing cable franchise. Our review of these conclusions supporting the district court's entry of summary judgment is de novo. See, e.g., City Communications, Inc. v. City of Detroit, 888 F.2d 1081, 1084 (6th Cir.1989).
 
 II.
 
 19
 Section 1 of the fourteenth amendment forbids states and local governmental units to "deprive any person of ... property, without due process of law." See U.S. CONST. amend. XIV, Sec. 1. As the limiting reference to "property" suggests, "[t]he Fourteenth Amendment places procedural constraints [only] on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978). In addition, the Supreme Court has explained that "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised ... decisions." Bishop v. Wood, 426 U.S. 341, 350 (1976). Rather, the due process clause simply ensures that deprivation of a protected property interest must " 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)). Thus, we must initially examine the contours of Triad's property interest to ascertain whether a deprivation of property has, in fact, occurred. We then must focus on the type of " 'hearing appropriate to the nature of [a] case' " involving the award of a competing cable franchise. See id.
 
 A. Deprivation of Property
 
 20
 The Supreme Court has indicated that "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....' " Loudermill, 470 U.S. at 538 (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)). Here, the district court correctly reasoned that, because franchises can give rise to property interests, see New York Elec. Lines Co. v. Empire City Subway Co., 235 U.S. 179, 193 (1914), the non-exclusive franchise in this case "gave [Triad] some vested property rights." See Carlson v. Village of Union City, Michigan, 601 F.Supp. 801, 813 (W.D.Mich.1985) (emphasis omitted). Since the franchise agreement serves as the sole basis for the property rights asserted in this case, however, Triad's "vested property rights can be no broader than [its] contractual rights." Id. Consequently, Triad cannot claim a deprivation of any property interest unless the City's decision to grant a competing franchise to Americable impinged upon Triad's rights under its non-exclusive franchise.
 
 
 21
 In Helena Water Works Co. v. Helena, 195 U.S. 383 (1904), the Supreme Court emphatically stated that "the grant of [a] franchise does not of itself raise an implied contract that the grantor will not do any act to interfere with the rights granted" to the franchise holder. Id. at 388. In this respect, a holder of a non-exclusive franchise has no authority to demand "immunity from competition." See, e.g., Durham v. North Carolina, 395 F.2d 58, 61 (4th Cir.1968). Based upon this principle, we conclude that a municipality may freely award competing franchises without unconstitutionally impairing or reducing a non-exclusive franchise holder's vested property interests. Despite Triad's speculative concerns about the detrimental impact competition will have on its business and the local cable television market, the company has failed to identify any enumerated right under its non-exclusive franchise that has been revoked or any privilege that has been dishonored due to the award of a competing franchise. Triad's contention that it has been deprived of a property right, therefore, is meritless.
 
 
 22
 B. The Process Required in Awarding Cable Franchises
 
 
 23
 We not only reject Triad's deprivation of property theory, which is an essential predicate to the company's due process claim, but also repudiate the company's view of the process due in the context of awarding competing cable franchises. The Supreme Court has commented that, when an impending deprivation of a property interest necessitates "due process," the "formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved...." Boddie v. Connecticut, 401 U.S. 371, 378 (1971). Triad argues that the deleterious effect of overbuilds on existing cable operators and local markets suggests that municipalities must consider the economic impact of allowing two operators to compete in a single market before awarding competing franchises. We disagree.
 
 
 24
 We have indicated that, as a general matter, the distribution of cable franchises should be left to the discretion of local governmental bodies. Cf. City Communications, 888 F.2d at 1090 ("federal courts are not ... cable television franchise distributors"). For this reason, our deference in Communications Systems, Inc. v. City of Danville, Kentucky, 880 F.2d 887 (6th Cir.1989), to the municipality's conclusion that the local market could support only one cable operator does not even suggest that the City of Hastings was constitutionally compelled to reach a contrary conclusion before awarding a competing franchise. Cf. id. at 892. Indeed, first amendment considerations identified by the Supreme Court in City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 494-96 (1986), call into question any refusal to award a competing franchise, even in a small market that clearly amounts to a "natural monopoly." See, e.g., Central Telecommunications, Inc. v. TCI Cablevision, Inc., 800 F.2d 711, 717 (8th Cir.1986) (addressing first amendment challenge to award of de facto exclusive franchise in "natural monopoly" market), cert. denied, 480 U.S. 910 (1987). If a municipality chooses to permit competition to avoid potential liability for first amendment violations, to offer another option to disgruntled customers of an existing operator, or simply to reap the perceived benefits of enhanced competition, the due process clause does not require the municipality to analyze the economic consequences of its decision prior to granting a competing franchise.
 
 
 25
 AFFIRMED.
 
 
 
 [1]
 The district court also granted summary judgment on the plaintiff's claim under the Cable Communications Policy Act of 1984, 47 U.S.C. Secs. 521-613, and dismissed the plaintiff's state law contract claims without prejudice, but the plaintiff chose not appeal those aspects of the district court's ruling
 
 
 [2]
 " 'Overbuild' refers to a situation in which a second cable television operator wires the same streets and competes head-to-head for subscribers with the operator which first served the area." Nishimura v. Dolan, 599 F.Supp. 484, 489 n. 4 (E.D.N.Y.1984)
 
 
 [3]
 The mayor of Hastings sent Triad a letter on January 13, 1989, apprising the company of the scheduled hearing and inviting company representatives to attend the public meeting
 
 
 [4]
 The City received (and included in the record) a significant number of letters from cable subscribers complaining about poor picture quality, temporary loss of stations, and a lack of selection on the Triad system. Many writers encouraged the City to switch cable operators to improve service
 
 
 [5]
 A formal extension agreement between the City and Triad was executed on November 13, 1989. The extension agreement explicitly provides that "there shall be no further automatic extensions of [Triad's] franchise in [the] City beyond May 12, 2005."
 
 
 [6]
 The City subsequently awarded a competing franchise to Americable